```
UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------x          20-CR-185(LJV)
UNITED STATES OF AMERICA,

vs.
                                     Buffalo, New York
KEYONDRE ROBINSON                    March 22, 2022
              Defendant.
--------------------------x
```

**PRELIMINARY HEARING**

TRANSCRIPT OF PROCEEDINGS
BEFORE MAGISTRATE JUDGE JEREMIAH J. MCCARTHY
UNITED STATES MAGISTRATE JUDGE


```
                        JAMES P. KENNEDY JR., ESQ.
                        United States Attorney
                        BY:  FRANZ M. WRIGHT, AUSA
                        Federal Centre
                        138 Delaware Avenue
                        Buffalo, New York 14202

FOR DEFENDANT:          MARIANNE MARIANNO, ESQ.
                        Federal Public Defender
                        BY:  FRANK RICHARD PASSAFIUME, AFPD
                        BY:  JEFFREY BAGLEY, AFPD
                        300 Pearl Street
                        Suite 200
                        Buffalo, New York 14202


ALSO PRESENT:           ALICIA PAYNE, U.S. PROBATION OFFICER




TRANSCRIBER:            Diane S. Martens
                        dimartens55@gmail.com


 (Proceedings recorded by electronic audio recording,
  transcript produced by computer.)
```

**P R O C E E D I N G S**

\*          \*          \*

(**WHEREUPON**, defendant present.)

**THE CLERK:**  We are on the record in the matter of United States versus Keyondre Robinson, criminal matter number 20-CR-185.

We're here for a preliminary hearing on a petition for an offender under supervision.

For the government, AUSA Franz Wright.

The defendant is present with FPDs Frank Passafiume and Jeff Bagley.

From the United States probation office Alicia Payne.

The Honorable Jeremiah J. McCarthy presiding.

**MAGISTRATE JUDGE MCCARTHY:**  Good morning, everyone.

**MR. WRIGHT:**  Morning, Judge.

**MR. PASSAFIUME:**  Morning, your Honor.

**MR. BAGLEY:**  Morning.

**MAGISTRATE JUDGE MCCARTHY:**  Are we ready to proceed with the preliminary hearing?

**MR. PASSAFIUME:**  Yes, Judge.

**MR. WRIGHT:**  Yes, your Honor.

**MAGISTRATE JUDGE MCCARTHY:**  Okay.

**MR. WRIGHT:**  The government calls Alicia Payne, your Honor.

1    **MAGISTRATE JUDGE MCCARTHY:** Ms. Payne, would you step

2  forward, please.

3

4    **ALICIA PAYNE,** called as a witness, being duly sworn,

5  testifies as follows:

6  **DIRECT EXAMINATION BY MR. WRIGHT:**

7    **Q**    Good morning, Mrs. Payne.

8    A    Good morning.

9    **Q**    Where do you work?

10   A    I work for the U.S. Probation and Pretrial

11 Services.

12   **Q**    And what are your responsibilities there?

13   A    I insure clients of conditions that are set by the

14 judge for individuals that are placed on supervised release

15 or probation.

16   **Q**    Are you familiar with Keyondre Robinson?

17   A    I am.

18   **Q**    When did you start working on this case?

19   A    When he was released, I believe May of last year,

20 for a term of one year supervised release after pleading

21 guilty to a charge.  I can't recall what the charge is.

22   **Q**    And did there come a time where the defendant was

23 sentenced --

24   A    Yes.

25   **Q**    -- in that case?

1    A    Yes.

2    **Q**    And did the judge issue a judgment in that case?

3    A    Yes.

4    **Q**    Were there any conditions that were --

5    A    Yes.

6    **Q**    -- provided by the Court?

7    A    Yes.

8    **Q**    And what do you recall or remember some of the

9    conditions related to Mr. ...

10    A    Some of the mandatory conditions:  Not to commit a

11    new federal, state or local crime.  Not to possess or use any

12    controlled substance, report as directed, special conditions

13    would include a search condition, he had to complete a

14    domestic violence program.  He had to engage in a mental

15    health evaluation.  And if treatment was recommended, he was

16    to abstain from the use of alcohol.

17    **Q**    Did there come a time where there were any changes

18    to his conditions?

19    A    Yes.

20    **Q**    Do you recall when?

21    A    We modified -- the modification happened on

22    September 1st of 2021.  And then just most recently March 1st

23    of 2022.

24    **Q**    And do you recall some of the terms of those

25    changes?

1      A      The initial change, September 1st 2021,

2  modification was sent to the Court requesting that he be

3  placed at a RRC or reentry center, community center.  Pending

4  the placement of that, that he be placed on location

5  monitoring under a curfew restriction.  That was based on him

6  testing positive for marijuana.  That was -- he committed a

7  new crime.  There was some issues with his attendance with

8  mental health treatment and there was also some issues of

9  attendance with the domestic violence program.

10     Q      And relating to the conditions of the location

11 monitoring, where was that -- where was he living at that

12 time?

13     A      At that time he was living at his grandmother's

14 residence in Cheektowaga.

15     Q      And based on your work in this case, what have you

16 learned related to that residence?

17     A      That residence is a residence for individuals that

18 are elderly or disabled.  It's a -- I believe it's a

19 state-run facility or a county-run facility and I think you

20 got to meet certain criteria in order to reside there:

21 Disabled or elderly.

22     Q      So based on your work, can the defendant reside

23 there?

24     A      No.

25     Q      You mentioned earlier the residential reentry

1   center?

2      A    Yes.

3      Q    What is that?

4      A    That is a halfway house here locally in Buffalo

5   where individuals could be -- can be placed there and be

6   placed under different rules and regulations for a period of

7   time to, to address any noncompliance issues that doesn't

8   necessarily warrant the judge's attention.

9      Q    And are there certain rules or regulations that are

10  in place?

11     A    Yes.

12     Q    Relating to the defendant, how -- what are, what

13  are the terms of his stay at a residential reentry center,

14  like how long was he supposed to stay there for?

15     A    I think -- so initially the September 1st, 2021,

16  modification, that was originally for three months stay, if

17  I'm not mistaken.  I don't, I don't recall if it was three

18  months or two months, that timeframe.

19         And then just most recently I had a conversation with

20  Mr. Robinson about extending his stay until his expiration

21  date off supervised release which would have been in May of

22  this year.

23     Q    And based your interaction with the defendant, has

24  the defendant complied with the terms or rules and

25  regulations at the RCC?

Payne - Cross - Passafiume

1    A    Based on the communication with the staff at RRC,

2   no, he has not.

3    Q    And have you interacted with the defendant since

4   he's been there?

5    A    I have interacted with the defendant.  The first

6   day he arrived there, I interacted with him on March 1st when

7   we talked about the extension of the modification.

8    Q    And what was the result of that interaction?

9    A    Basically he's got to, you know, follow the rules

10   and regulations and anything that's requested by him -- of

11   him by the residential staff.

12    **MR. WRIGHT:**  No further questions for Ms. Payne, your

13   Honor.

14    **MAGISTRATE JUDGE MCCARTHY:**  Thank you.

15   **CROSS-EXAMINATION BY MR. PASSAFIUME:**

16    Q    Hi, Officer Payne?

17    A    Hi.

18    Q    How do you guys get assigned to supervisees, is it

19   random?

20    A    It is random.

21    Q    And whether you're assigned or after you're

22   assigned, you obviously become familiar with the supervisee?

23    A    Yes.

24    Q    You review the PSR?

25    A    Yes.

Payne - Cross - Passafiume

1    **Q**    So you're aware that Mr. Robinson was convicted of

2    a misdemeanor which is the crime that placed him on

3    supervised release, right?

4    A    Yes.

5    **Q**    And that he served eight months in custody for that

6    misdemeanor --

7    A    Yes.

8    **Q**    -- right?  And you also knew that he -- when he

9    started supervised release in May of 2021, he was 19 years

10   old, right?

11   A    Yes.

12   **Q**    As you testified, it's a one-year term of

13   supervised release?

14   A    Yes.

15   **Q**    And some of the conditions -- I know you spoke to a

16   couple of them now but I just want to go through them.  One

17   was that he had to work full time?

18   A    Correct.

19   **Q**    And that's 30 hours per week, right?

20   A    Correct.

21   **Q**    He had to go to mental health treatment?

22   A    Yes.

23   **Q**    And that treatment involved sessions with a

24   therapist or counselor?

25   A    Correct.

Payne - Cross - Passafiume

1    Q    That could be individual?

2    A    Yes.

3    Q    Or group sessions?

4    A    Yes.

5    Q    And the frequency is dictated by the mental health

6  treatment provider?

7    A    Correct.

8    Q    Also substance abuse treatment?

9    A    If deemed necessary, yes.

10    Q    And that's also individual or group, right?

11    A    Correct.

12    Q    And the frequency dictated by the substance abuse

13  provider?

14    A    Correct.

15    Q    That includes drug testing?

16    A    Correct.

17    Q    He also had to be -- submit to a search based on

18  reasonable suspicion?

19    A    Correct.

20    Q    And the domestic violence program which you just

21  mentioned?

22    A    Yes.

23    Q    And you're familiar with that program?

24    A    Yes.

25    Q    That's the 26-week program that people, you know,

Payne - Cross - Passafiume


1    defendants are often referred to in Erie County in general,

2    right?

3         A    Correct.

4         Q    There's one domestic violence program.  This is the

5    main one, that's it?

6         A    Yes.

7         Q    Okay.  His term of, Mr. Robinson's term of

8    supervision was set to expire in May of 2022, just like in a

9    month and a half?

10        A    Yes.

11        Q    So, again, you talked about this briefly.  I just

12   want to go through a little bit more.

13        In September of 2021, four months into his term of

14   supervised release, that's when you first petitioned the

15   District Court to add additional conditions of supervision?

16        A    Correct.

17        Q    And those are on top of the conditions that were

18   imposed at sentencing?

19        A    That's correct.

20        Q    At the time Mr. Robinson was working at City

21   Mattress?

22        A    I believe so, yes.

23        Q    And, by the way, just to get it out of the way,

24   Mr. Robinson generally maintained employment while on

25   supervision, right?

Payne - Cross - Passafiume

1       A       That's correct.

2       Q       At City Mattress June of 2021 to September of '21?

3       A       (No response.)

4       Q       Does that sound familiar?

5       A       It sounds, it sounds familiar, yes.

6       Q       He also worked at a place called Gene McCarthy's?

7       A       For a short time, yes.

8       Q       And he also worked at the Bravo! restaurant at the

9  Galleria, right?

10      A       Yes.

11      Q       So back to the September 2021 petition, that added

12 a location monitoring program to his terms of supervision,

13 right?

14      A       That was in place for until we waited for word from

15 the halfway house as when a bed would become available.

16      Q       Right.  Okay.  Because there's always a delay for

17 when a bed's available, right?

18      A       Correct.

19      Q       And that condition came with a curfew from 8 p.m.

20 to 8 a.m.?

21      A       Or as adjusted for -- to meet his employment needs.

22      Q       So when he's not working, though, he's got to be in

23 bed by 8 basically?

24      A       In the house, correct.

25      Q       That also came with an ankle monitor, right?

Payne - Cross - Passafiume

1      A    Correct.

2      Q    And supervisees have to pay for that ankle monitor?

3      A    Some of them do, depending on their employment

4  status.  If they're able to pay, then, yes, they have to pay.

5  If not, then agency will pay.

6      Q    And that rings true for like the copays associated

7  with treatment, as well?

8      A    Same thing.  If we're -- the agency is able to pay

9  for individuals who are unable to provide any type of funds

10  on their own.

11      Q    Makes sense.  They can't take blood from a rock?

12      A    That's right.

13      Q    So they can't pay you.  And then kind of why we're

14  here, they added this condition to go to the halfway house

15  for two months, right?

16      A    Correct.

17      Q    And to obey all the rules and regulations of the

18  halfway house?

19      A    Correct.

20      Q    And those are different rules imposed -- they're

21  different than the conditions that the Court imposed at

22  sentencing?

23      A    That's correct.

24      Q    They're not U.S. Probation's rules and regulations?

25      A    That's correct.

Payne - Cross - Passafiume

1       Q      They're just the rules of the halfway house?

2       A      Correct.

3       Q      The halfway house specifically in Buffalo?

4       A      Yes.

5       Q      And when I say go to the halfway house, he had

6    to -- Mr. Robinson had to go live there?

7       A      That's correct.

8       Q      And the halfway house is not like a youth center,

9    right?

10      A      I don't know what --

11      Q      Strike that.  So there are people of all ages that

12   are at the halfway house, right?

13      A      Yes.

14      Q      So there are people that just served a lengthy

15   prison sentence, they're coming, transitioning into the

16   community, they go to the halfway house?

17      A      That's correct.

18      Q      Could be gang members, right?

19      A      Could be anybody.

20      Q      Drug dealers?

21      A      Anybody.

22      Q      Drug addicts?

23      A      Same with anybody in the community, yes.

24      Q      And you've had your fair share of ob -- of

25   violations of like drug use and drug paraphernalia at the

Payne - Cross - Passafiume

1    halfway house, right?

2        A    That's correct.

3        Q    And you petitioned the Court to do this.  Obviously

4    you can't do it for no reason.  You talked about some of the

5    reasons here and I just want to go through them.

6        The first one you said that Mr. Robinson committed a

7    state or local crime, right?

8        A    Correct.

9        Q    And that's the stuff about the order of protection?

10       A    Correct.

11       Q    So, the order of protection between him and his

12   girlfriend, right?

13       A    Correct.

14       Q    There are like two orders in place, right?

15       A    Yes.

16       Q    And one order actually was extended and nobody knew

17   about it because of the pandemic, right?

18       A    Correct.

19       Q    And the other one was, I think, about to expire but

20   those are the actual charges that were pending, right?

21       A    Yes.

22       Q    The Hamburg (phonetic) one.  And eventually all

23   that stuff got dismissed?

24       A    Correct.

25       Q    The second reason that you mention here is that

Payne - Cross - Passafiume


1   Mr. Robinson didn't go to all of his mental health treatment

2   sessions, right?

3       A    There was some issues with his attendance, correct.

4       Q    So he, he missed -- in the petition I see he missed

5   June 28th of 2021 and August 16th of 2021?

6       A    If that's what's in the petition, yes.  I don't

7   recall the exact dates.

8       Q    And at the time he was going, maybe you don't

9   recall, biweekly, does that sound right?

10      A    Yes.

11      Q    So there were appointments between June 28th and

12  August 16th, right, if he's going biweekly?

13      A    Correct.

14      Q    And there's no -- nothing in the petition that says

15  he missed any of those appointments, if you remember?

16      A    I don't recall.

17      Q    Okay.  Now the third reason why you petitioned the

18  Court to send him to the halfway house is that he tested

19  positive for marijuana on June 24, 2021?

20      A    Correct.

21      Q    And he admitted that he used?

22      A    Correct.

23      Q    He also admitted that he used in August of 2021?

24      A    Correct.

25      Q    But there's no positive tests for that, that was

Payne - Cross - Passafiume

1    just his admission?

2       A    That's his admission.

3       Q    All right.  And the final reason is that he didn't

4    complete the domestic violence program?

5       A    Correct.  There was some, once again, some more

6    attendance issues and based on the week, the weeks that

7    are -- he has to complete it, he wasn't enrolled and wouldn't

8    be finished in time for the end of supervised release.

9       Q    So -- correct.  It's a six-month program.  He

10   couldn't have completed it by September --

11      A    Correct.

12      Q    -- right?  All right.  Because at that time it was

13   only four months that he's been on supervision.  In any

14   event, he was ordered to go to the halfway house by Judge

15   Vilardo and he did in January of 2022, right?

16      A    Yes.

17      Q    And it was a two-month stint, am I --

18      A    It was two months?

19      Q    Yeah.

20      A    Okay, two months.

21      Q    So that means he would leave around February or

22   March, if I can add, January plus two, is that --

23   mid-January?

24      A    Yes, he was scheduled to leave March 17th, I

25   believe.

Payne - Cross - Passafiume

1    Q    Yeah, okay, that sounds right.  But he didn't leave

2    because the -- his time there was extended?

3    A    Correct.

4    Q    To May?

5    A    Correct.  Which he agreed to that.

6    Q    Right.  Right.  These are all modifications that he

7    agreed to.  I'm not saying otherwise.

8    A    Yes.

9    Q    And that -- he was going to basically finish out

10   his term of supervised release at the halfway house?

11   A    That's correct.

12   Q    And I guess -- that brings us to the, to the

13   violations, kind of why we're here today.  Your knowledge of

14   the violations just come from the halfway house?

15   A    That's correct.

16   Q    And nothing --

17   A    And communication, also, too, with the staff at the

18   halfway house, correct.

19   Q    Okay, nothing that you personally observed or?

20   A    Nothing that I personally observed, no.

21   **MR. PASSAFIUME:**  No further questions.  Thanks, Officer.

22   **MR. WRIGHT:**  One question, your Honor.

23   **REDIRECT EXAMINATION BY MR. WRIGHT:**

24   Q    So although the halfway house had their own

25   separate rules and regulations, the Court did issue

Jackson - Direct - Wright

1    conditions stating that the defendant could not -- should

2    abstain from alcohol?

3        A    Yes, the -- his supervised release conditions still

4    remain in effect regardless if he's at the halfway house or

5    not.

6        MR. WRIGHT:  Okay, thank you.

7        That's it, your Honor.

8        MAGISTRATE JUDGE MCCARTHY:  Thank you.

9        THE WITNESS:  Thank you, Judge.

10       (**WHEREUPON**, witness excused.)

11       MAGISTRATE JUDGE MCCARTHY:  All right.  Any other

12   witnesses?

13       MR. WRIGHT:  Yes, your Honor.

14       The government calls Joel Jackson from the residential

15   center, your Honor.

16       MAGISTRATE JUDGE MCCARTHY:  Morning, sir.

17       THE WITNESS:  Morning.

18

19       JOEL JACKSON, called as a witness, being duly sworn,

20   testified as follows:

21   DIRECT EXAMINATION BY MR. WRIGHT:

22       Q    Good morning, Mr. Jackson.

23       A    Good morning, sir.

24       Q    Where do you work?

25       A    I work at the Lighthouse Reentry Center.

Jackson - Direct - Wright

1      **Q**    And how long have you worked there?

2      A    Since September of 2021.

3      **Q**    And what are your responsibilities there?

4      A    I'm a case manager.  And as a case manager, what I

5 do is I work with residents that are assigned to me, help

6 them establish -- obtain identifications, if they don't have

7 it.  A lot of the people are coming from prison so they don't

8 have like state ID.  They don't have security cards, birth

9 certificates.  So that's one of the facets I help them with.

10 I assist them in looking for employment, housing.

11      **Q**    Sure.

12      A    Things like that.

13      **Q**    Is the defendant Keyondre Robinson one of the

14 individuals you worked with?

15      A    Yes, he's one of my residents I work with, yes.

16      **Q**    And when did you start working with him?

17      A    He came into the facility January 18th of this

18 year.

19      **Q**    And, generally, can you describe the process and

20 procedures when a new individual -- when an individual --

21      A    When --

22      **Q**    -- comes --

23      A    -- a new person comes into the facility, they meet

24 with our intake coordinator who basically goes over cell

25 phone rules, general rules of the facility, checks them into

Jackson - Direct - Wright

1   their room, things like that.

2       Q    So the rules and regulations are described to --

3       A    Correct.  Yeah, they're given a copy of the rules

4   and regulations of the facility.

5       Q    If there are any incidents that occur with the

6   individual who's residing at the center, is there a certain

7   process and procedure that --

8       A    Yeah.

9       Q    -- happens?

10      A    Usually the program monitors, that's the immediate

11  staff on hand, they're the usually ones that observe any kind

12  of incidents and they write them up.

13      Q    Okay.  When you say "write them up", they document?

14      A    Document it on paper, yeah, if --

15      Q    Okay.

16      A    -- they break a rule.

17      Q    And do you review --

18      A    Yes.

19      Q    -- those?

20      A    I --

21      Q    -- reports?

22      A    Check the daily logs so I can tell who, who's given

23  an incident report over the night or over the weekend.

24      Q    Okay.  And relating to Keyondre Robinson, were

25  there any such reports filed?

Jackson - Direct - Wright

1   A   Yes.

2   Q   Okay.  Do you recall generally the dates of --

3   A   Yeah, I think the first one he received on the

4   books was February 17th of this year.  And that was for

5   refusal of, I believe it was a UA and a urinalysis, as well

6   as a breathalyzer.

7   Q   Okay.

8   (WHEREUPON, discussion was held off the record.)

9   Q   Showing you what's been marked as Government

10  Exhibit 1 (phonetic).  Do you recognize that document?

11  A   Yes.

12  Q   Can you describe the document?

13  A   It's, it's basically a copy of our incident reports

14  that we -- that the program monitors fill out and complete

15  and then the resident gets served a copy and then obviously

16  we hold on to the copy.

17  Q   Did you review this document (phonetic)?

18  A   Yes, I did.

19  MR. WRIGHT:  (Indiscernible) would like to move

20  Government Exhibit 1 into evidence, your Honor.

21  MR. PASSAFIUME:  No objection.

22  MAGISTRATE JUDGE MCCARTHY:  Okay.  Government Exhibit 1

23  is in evidence.

24  Q   And you stated earlier that an incident occurred on

25  February 17th of 2022.  Do you recall what happened related

Jackson - Direct - Wright

1    to Keyondre Robinson?

2        A    Related to that one we just saw?

3        Q    Yeah.

4        A    Yes.  I believe he come in from work and he refused

5    to give a UA, which is a urinalysis sample, as well as a

6    breath -- intoxica, you know, a breathalyzer.

7        Q    And is that a violation in any way of --

8        A    It is.  I mean, they, they sign and they agree to

9    this when they come to our facility.  Any time a resident

10   comes from the outside into the facility, whether they're

11   coming from work or a doctor's appointment, they're required

12   to do one.

13       Q    Okay.

14       A    One or both of those.

15       Q    I'll show you what's been marked as Government

16   Exhibit 2.  Can you take a look at that document.

17       A    One sec.  Yeah.

18       Q    Did you review this document (indiscernible)?

19       A    Yes.

20       **MR. WRIGHT:**  Government would like to move Exhibit 2

21   into evidence.

22       **MAGISTRATE JUDGE MCCARTHY:**  What is it?

23       Q    Oh.  What is this document?

24       A    It's another incident report from March 6th.

25       **MR. WRIGHT:**  Government would like to move Government

Jackson - Direct - Wright


1    Exhibit 2 into evidence, your Honor.

2         **MR. PASSAFIUME:**  No objection, Judge.  I think these are

3    all reports.  We don't object.

4         **MAGISTRATE JUDGE McCARTHY:**  Okay.  Government Exhibit 2

5    is in evidence.

6         **Q**    Do you recall another incident that occurred

7    relating to Keyondre Robinson?

8         A    Since that one?  Yes, I believe on the 13th of

9    this -- of March, as well as the 17th of March, he had come

10   in from work on both occasions and he blew positive for

11   alcohol content --

12        **Q**    Okay.

13        A    -- on both occasions.

14        **Q**    And before addressing the ones on March 13th and

15   March 17th, on March 6th, did, did an incident occur?

16        A    Yeah, I believe one of the program monitors

17   encountered Mr. Robinson in the hallway and wanted to do a

18   general patdown search.  And at that time, you know, he kind

19   of refused.  Went back into his room.  Came out a couple

20   minutes later and then he subjected himself to a patdown

21   search.

22        **Q**    Is the refusal a violation --

23        A    Yes.

24        **Q**    -- of --

25        A    Yes.

Jackson - Direct - Wright

1    **Q**    And then, finally, I'm showing you one more.

2    **MAGISTRATE JUDGE MCCARTHY:**  Just.  So on the 6th, he

3    initially refused and then he did submit to the patdown.

4    **THE WITNESS:**  Yeah.  He had gone, you know, he refused

5    the program monitor, went into his bedroom.  He was right out

6    in the hallway outside his bedroom.  Went into his room for a

7    minute or two and then he came back out and said okay.

8    **MAGISTRATE JUDGE MCCARTHY:**  Okay.

9    **Q**    You mentioned earlier the incident that occurred on

10   March 13th?

11   **A**    Yes.

12   **Q**    What incident was that?

13   **A**    The scenario was I believe he came in from work,

14   you know, it was around 11, 12, something like that.  And as

15   one of the requirements, he was given a breathalyzer and he,

16   and he came, he blew, you know, over zero zero, so -- which

17   depicted he had alcohol on his breath.

18   **Q**    I'm showing you what's been marked as Government

19   Exhibit 3.  What is that document?

20   **A**    This is the incident report from the day of the

21   13th.

22   **Q**    Are you familiar with that (phonetic)?

23   **A**    Yes.

24   **MR. WRIGHT:**  (Indiscernible) I would move Government

25   Exhibit 3 in evidence.

Jackson - Direct - Wright

1    **MR. PASSAFIUME:**  No objection.

2    **MAGISTRATE JUDGE MCCARTHY:**  Government Exhibit 3 is in

3    evidence.

4    **Q**    Is alcohol one of the rules and -- or -- is

5    abstaining alcohol -- from alcohol one of the rules and

6    regulations that are in place at the center?

7    A    Yes.

8    **Q**    Okay.

9    A    Any, any type of drugs or alcohol, correct.

10   **Q**    And so a breathalyzer was conducted on

11   Mr. Robinson?

12   A    Yes.

13   **Q**    And what, what dates do you recall that this

14   occurred?

15   A    I believe that was on the 13th to the 14th.

16   **Q**    Were there any other instances of --

17   A    There was another one following the -- the 17th, I

18   believe it was.

19   **Q**    Okay.  And in both instances what happened?

20   A    He blew positive --

21   **Q**    Okay.

22   A    -- for alcohol.

23   **MR. WRIGHT:**  No further questions, your Honor.

24   **MAGISTRATE JUDGE MCCARTHY:**  Thank you.

25   **CROSS-EXAMINATION BY MR. PASSAFIUME:**

Jackson - Cross - Passafiume

1     **Q**    You're Mr. Robinson's case manager?

2     A    Yes.

3     **Q**    And you talked a little bit about the rules and

4 regulations of the halfway house.  Do you mean like this

5 handbook?

6     A    Correct.

7     **Q**    So this (indicating) -- I'm holding up a handbook.

8 It's the Lighthouse handbook, 50 pages long.  These are all

9 the rules and regulations?

10    A    Yes.

11    **Q**    And is a copy of this given to everybody at the

12 halfway house?

13    A    Correct, yes.

14    **Q**    And is a copy of this -- do you work personally

15 hand in hand with residences of the halfway house and go

16 through them?

17    A    Oh, yes.  Part of the next step after -- when they

18 first come to our facility after being intaked by Mr. Warden

19 (phonetic), within three days I meet with them and I do a

20 general orientation.

21    **Q**    A general orientation?

22    A    Which, which addresses every issue that we're going

23 to be going through while they're in our program.

24    **Q**    And it's this thing that he signs when you're

25 saying he signed the rules and regulations?

Jackson - Cross - Passafiume

1    A    He, he signed that he received a copy when he was

2  with Mr. Warden.

3    Q    Yeah.

4    A    And the day of orientation he signed several

5  documents with me, as well.

6    Q    Okay.

7    A    Those being resident accountability form, the

8  agreement to breathalyzer and a UA, and a orientation

9  checklist which is basically that handbook being one of

10 the --

11   Q    Okay.  And he, he can't go to the halfway house

12 without signing those documents, right?

13   A    I mean, he's already in the facility at that

14 point --

15   Q    Right.

16   A    -- when I meet with him.  I believe he has to sign

17 a document or two with probation or if he's in --

18   Q    Right.  Right.

19   A    -- the jail, he has to sign those with them, as

20 well.

21   Q    But once he's there, he can't say no, I refuse to

22 sign the handbook, I don't want to do it -- I want to live

23 here but I can't -- I'm not going to sign anything?  He can't

24 do that?

25   A    I've never encountered that.

Jackson - Cross - Passafiume

1    **Q**    Okay.

2    **A**    Encountered that, so.

3    **Q**    Let me go through some of the allegations in the

4    petition.  So February 17th, Mr. Robinson you're saying he

5    refused the urine sample --

6    **A**    Yes.

7    **Q**    -- right?  It was at 11:40 p.m. in the incident

8    report?

9    **A**    I believe so, yes.

10   **Q**    All right.  And he said he was tired, that's why he

11   didn't want to give the sample, right?

12   **A**    According to the --

13   **Q**    I'm just --

14   **A**    -- document.

15   **Q**    -- going --

16   **A**    Yep, according to the document.

17   **Q**    To the incident report, right?

18   Well, did you create that document?

19   **A**    No, I did not.

20   **Q**    No.  You just review it?

21   **A**    Correct.

22   **Q**    And these documents are supposed to be accurate?

23   **A**    Yes.

24   **Q**    Right, they want to contain all relevant and

25   salient facts?

Jackson - Cross - Passafiume

1      A    Correct.

2      Q    Because obviously you're testifying about that

3  document.  You weren't there.  That document basically speaks

4  for itself, right?

5      A    Correct.

6      Q    It's like a police report almost but for the

7  halfway house?

8      A    Yes.

9      Q    Okay.  So, so in that document it said he was

10  tired, right?

11      A    Yes.

12      Q    He just came back from work at 11:40?

13      A    Yes.

14      Q    The document doesn't say that I'm not urinating

15  again for you guys, right?

16      A    I don't -- no, it does not say that.

17      Q    He didn't say, you know, no more pee, I'm not going

18  to give it to you, I'm not taking these tests any more, these

19  tests are too much, right?

20      A    Correct.

21      Q    He just said he was tired, he couldn't give the

22  test at that moment?

23      A    Yes.

24      Q    And he gave a test the next morning, though, right?

25      A    I believe so, yes.

Jackson - Cross - Passafiume

1     Q    And it was negative?

2     A    Yes.

3     Q    And the purpose of these tests are to make sure

4   that there's no drugs or alcohol in somebody's system, right?

5     A    Correct.

6     Q    So, any drug or alcohol that's in somebody's system

7   at 11:40 would likely be in the system in the morning, right?

8     A    Yes.

9     Q    And that test in the morning was negative?

10    A    Correct.

11    Q    March 6th, Mr. Robinson allegedly refused this

12  order to be randomly searched, right?

13    A    Yes.

14    Q    And that was at 4:25 a.m.?

15    A    That's correct.

16    Q    So he, you know, woke up, had to use -- and this

17  was at -- strike that.

18        And this was during a trip to a bathroom, right?

19    A    I'm going to assume.

20    Q    That's what the incident report says?

21    A    (No audible response.)

22    Q    So Mr. Robinson woke up, had to use the bathroom.

23  He went.  And he was returning to his room and that's when,

24  you know, somebody tried to frisk him or pat him down, right?

25    A    Correct.

Jackson - Cross - Passafiume

1    Q    This is a halfway house rule, right?

2    A    Yes.

3    Q    That's not a condition of supervised release?

4    A    (No response.)

5    Q    That you know of?

6    A    Not that I'm aware of.

7    Q    And this is a standard procedure, right?

8    A    Yes.

9    Q    And it's for safety reasons, right?

10   A    Correct.

11   Q    And, again, this incident report that describes

12   this incident, it doesn't articulate a safety reason, meaning

13   there's nothing in the report about suspicious activity,

14   right?

15   A    Not that I could read.

16   Q    Like in the hall that day, right?

17   A    Yeah.

18   Q    Or if there was an incident earlier that day in the

19   bathroom where, like, a weapon could have been hidden in the

20   bathroom, right?

21   A    Correct.

22   Q    All that stuff would be in the report?

23   A    Yes.

24   Q    And it's not a long distance from the bathroom to

25   his room, right?

1    A    Correct.

2    Q    So the entire interaction lasted just a few

3  minutes, right?

4    A    Yeah.

5    Q    So he was coming -- going to his room, went in, you

6  know, consented, that was it, just a couple minutes basically

7  is what I'm getting at, right?

8    A    (No response.)

9    Q    Yeah?

10    A    Yes.

11    Q    And there's no other incident report of

12  Mr. Robinson refusing pat downs?

13    A    Not, not on record, no.

14    Q    If he did, there would be an incident report about

15  that?

16    A    Should be yes.

17    Q    Okay.  So this last charge in the petition involves

18  these, these positive alcohol tests and, and you refer to

19  these tests as a breathalyzer, right?

20    A    Yes.

21    Q    But it's not like a machine like I'm showing up two

22  manuals, like an Alcotest®, Dräeger's, it's not this big box?

23    A    No, it's not the big ones.

24    Q    So it's not a chemical test, right, so it's not --

25  these are breathalyzers, what you refer to as a breathalyzer

Jackson - Cross - Passafiume

1   is not one of these chemical machines, right?

2       A    Correct.

3       Q    And the difference between machines is these

4   chemical machines that are breathalyzers that are used in, in

5   DWIs and in New York State, these go through -- if you

6   know -- like rigorous scientific testing, right?

7       A    Correct.

8       Q    There's actually a New York State Department of

9   Transportation list that lists maybe a handful of these that

10  are approved to use by law enforcement, right?

11      A    Correct.

12  **THE CLERK:**  Sir, could you please pull the mike closer

13  to you.  I'm having trouble picking up.  Thank you.

14      Q    And these tests are scientific because they're

15  supposed to collect deep long breath and they pass it through

16  some solution and it spits out a number, it's a scientific

17  test, right?

18      A    Correct.

19      Q    These machines require maintenance and training,

20  right?

21      A    Yes.

22      Q    And these machines spit out detailed reports every

23  time a test is administered, right?

24      A    Correct.

25      Q    And some of these reports are, if you know, a

Jackson - Cross - Passafiume

1    breathalyzer test record, does that sound right?

2        A    Yes.

3        Q    Another one is an operational checklist, does that

4    sound right?

5        A    Okay.

6        Q    Just if you know.  If you don't know, just say you

7    don't know.

8        A    (No response.)

9        Q    The next one is kind of a maintenance log because

10   you got to figure out if these were properly maintained,

11   right?

12       A    Yes.

13       Q    And then there's the scientific stuff that I have

14   no idea how to pronounce:  The breathalyzer ampule test,

15   right?

16       A    Yes.

17       Q    There's also these certificates of calibration,

18   again, because these machines have to be accurate because

19   it's the basis of prosecutions, right?

20       A    Yep.

21       Q    And these are all standard for these chemical test

22   machines, right?

23       A    Yes.

24       Q    You don't have these documents for whatever you

25   have, right?

Jackson - Cross - Passafiume

1      A     Correct.

2      Q     Yours is a handheld Alco-sensor test?

3      A     Correct.

4      Q     It's a handheld device that you put up to

5   somebody's mouth and they blow?

6      A     Correct.

7      Q     These machines are just given to law enforcement?

8   I can't go and buy one -- I had to steal this manual -- I

9   could go buy this Alco-sensor test or a test --

10     A     Correct.

11     Q     -- like that at any store, right?

12     A     Yes.

13     Q     There's no calibration, right?

14     A     Not to my knowledge.

15     Q     There's no maintenance of them, right?

16     A     Not that I'm aware of.

17     Q     Do they run on batteries?

18     A     I'm assuming.

19     Q     Okay.  And these tests, if you know, it seems like

20  you know some stuff about, about these machines.  In New York

21  State court, these things are admissible at trial but results

22  from your Alco-sensor aren't, are you aware of that?

23     A     Yes.

24     Q     Because they're unreliable, right?

25     A     I don't know about the unreliable.

Jackson - Cross - Passafiume

1    **Q**    Well, that's why -- well, you wouldn't know.
2    That's why they are inadmissible.  So, to kind of summarize,
3    you know, your extent, I should have talked to some of this
4    with Officer Payne but ...  So we're here for the
5    February 17th refusal to provide a urine sample but that he
6    gave on the 18th and was negative; is that right?
7    A    (No response.)
8    **Q**    Are those facts right?
9    A    State it again.
10   **Q**    February 17th?
11   A    Yes.
12   **Q**    He refused to give a urine sample.  February 18th
13   he did, it was negative?
14   A    Yes.
15   **Q**    This refusal to the patdown search on March 6th
16   which then he gave a couple minutes later?
17   A    (No response.)
18   **Q**    Consented?
19   A    Yes.
20   **Q**    And then these -- not breathalyzer tests -- but
21   these handheld contraption tests that said he drank alcohol?
22   A    Yes.
23   **MR. PASSAFIUME:**  All right.  No further questions,
24   Judge.  Thank you.
25   **MAGISTRATE JUDGE MCCARTHY:**  Thank you.

Jackson - Redirect - Wright

1    **REDIRECT EXAMINATION BY MR. WRIGHT:**

2    **Q**    For the breathalyzers that we've been referring to,

3    have you used those in the past as part of your work at RCC?

4    A    Yes.

5    **Q**    Okay.  And when you use them, did they exude

6    similar results if someone tested positive for alcohol or had

7    drank alcohol?

8    A    Yeah, I mean, anyone I've ever used it on has come

9    up double -- all zeros but I haven't tested anyone personally

10    that came up positive alcohol.

11    **MR. WRIGHT:**  Okay, thanks.

12    **MR. PASSAFIUME:**  Judge, can I ask just one question real

13    quick?

14    **MAGISTRATE JUDGE MCCARTHY:**  Yes.

15    **RECROSS-EXAMINATION BY MR. PASSAFIUME:**

16    **Q**    Whose decision is it to -- so the petition says

17    he's -- Mr. Robinson's not actually kicked out of the halfway

18    house yet, right?

19    A    (No response.)

20    **Q**    Or is he --

21    A    I know --

22    **Q**    -- because he's in jail?

23    A    I know they took him out yesterday, that's all I

24    know.

25    **Q**    Okay.  The petition says he's in the process of

Jackson - Recross - Passafiume

1    being discharged.  What does that mean to you?

2         A    The only way it applies to me is if someone comes

3    up on their end date.

4         Q    Okay.

5         A    In this case it would have been the -- originally

6    the 17th for him.  We would do our paperwork on our end.  We

7    would do an out.  Mr. Warden who was our intake/outtake

8    coordinator would do paperwork.

9         Q    Okay.

10        A    Discharging him from the program.

11        Q    And who makes the final call of discharge, is it

12   you, is it this intake?

13        A    We're associated with the BOP, Bureau of Prisons.

14        Q    And what if, what if somebody doesn't go there from

15   the BOP, he's just on supervision with U.S. Probation here?

16        A    Then as long as he's cleared by his probation

17   officer, probation office.

18        Q    So it's not the halfway house that makes the

19   ultimate determination whether he should leave, it's the

20   probation officer?  If you don't know, just say you don't

21   know.

22        A    Well, we do make recommendations in some cases.

23        Q    Okay.

24        A    Because of Keyondre not positively programming.

25        Q    And, and did you make a recommendation here?

Jackson - Recross - Passafiume

1    A    Me personally, I did not.

2    **Q**    And you're his case manager?

3    A    Correct.

4    **MR. PASSAFIUME:**  Thank you.

5    **MR. WRIGHT:**  North further, your Honor.

6    **MAGISTRATE JUDGE MCCARTHY:**  So just, sir, then has

7    someone made a recommendation that he be removed from the

8    premises.

9    **THE WITNESS:**  I'm assume -- I can only assume it was our

10   director.

11   **MAGISTRATE JUDGE MCCARTHY:**  Or you don't know?

12   **THE WITNESS:**  What's that?

13   **MAGISTRATE JUDGE MCCARTHY:**  You don't know, right?

14   **THE WITNESS:**  You know, like I said, I work with his

15   case management so I'm not privy to every conversation that

16   she has with probation or the Bureau of Prisons.

17   **MAGISTRATE JUDGE MCCARTHY:**  Okay, thank you.  You may

18   step down, sir.

19   **THE WITNESS:**  Thank you.

20   (WHEREUPON, witness excused.)

21   **MAGISTRATE JUDGE MCCARTHY:**  Anybody wish to be heard?

22   This is a probable cause hearing, not ultimate determination.

23   **MR. WRIGHT:**  Your Honor, I think the government rests in

24   this case, your Honor, based on the evidence that's been

25   produced.

Payne - Recross - Passafiume

1    **MAGISTRATE JUDGE MCCARTHY:**  Can I see the exhibits,
2    please.
3    **MR. WRIGHT:**  Yes, your Honor.
4    **PROBATION OFFICER PAYNE:**  And your Honor, just to --
5    **MAGISTRATE JUDGE MCCARTHY:**  Wait.
6    **PROBATION OFFICER PAYNE:**  -- answer.
7    **MAGISTRATE JUDGE MCCARTHY:**  Well --
8    **PROBATION OFFICER PAYNE:**  Sorry.
9    **MAGISTRATE JUDGE MCCARTHY:**  Are you going to be
10   testifying again or no?
11   **PROBATION OFFICER PAYNE:**  No, I was just, about, about
12   the question about who makes that decision as far as his --
13   **MAGISTRATE JUDGE MCCARTHY:**  Yeah.
14   **PROBATION OFFICER PAYNE:**  -- end, the end of the
15   program, the director, I've been in communication with the
16   director as far as discharge from the program.
17   **MR. PASSAFIUME:**  Judge, this is kind of testimony.  I
18   would like to ask questions if this.
19   **MAGISTRATE JUDGE MCCARTHY:**  Can you resume the stand,
20   please.
21   **PROBATION OFFICER PAYNE:**  Sure.
22   **MAGISTRATE JUDGE MCCARTHY:**  You're still under oath.
23   (WHEREUPON, Ms. Payne was recalled.)
24   **CROSS-EXAMINATION BY MR. PASSAFIUME:**
25   **Q**   Aside from today, when's the last time you talked

Payne - Examination by Judge McCarthy

1   to Mr. Jackson?

2       A    In reference to Mr. Robinson?

3       Q    Yeah.

4       A    I do not recall.

5       Q    Do not recall.  And Mr. Jackson, Mr. Robinson's

6   case manager, did not give you the recommendation that

7   Mr. Robinson's to be discharged from the program?

8       A    That's correct.

9       Q    That's a decision that you made with somebody from

10  the halfway house that did not involve Mr. Robinson's case

11  manager?

12      A    That's correct.

13      **MR. PASSAFIUME:**  No further questions.

14      **MR. WRIGHT:**  No questions.

15      **MAGISTRATE JUDGE MCCARTHY:**  Just a second, sorry.

16      So it was your recommendation in conjunction with the

17  director of the facility that he be terminated?

18      **THE WITNESS:**  It was both of our recommendation was

19  both -- we both came to an agreement that a discharge would

20  be warranted given the numerous incident reports that

21  occurred.

22      **MAGISTRATE JUDGE MCCARTHY:**  Okay.  Thank you.

23      (WHEREUPON, witness excused.)

24      **MAGISTRATE JUDGE MCCARTHY:**  Anybody wish to be heard

25  further?

US vs. Robinson - 20-CR-185

1        **MR. PASSAFIUME:**  Judge, briefly.

2        Again, it is a probable cause hearing.  There's not --

3    but I think with the testimony, everything you heard today,

4    Judge, even if you want to keep this, this petition open,

5    especially now with the last facts that Mr. Robinson's own

6    case manager didn't know he was being discharged, at a

7    minimum, I would renew my bail motion and ask for him to be

8    released.

9        The violations, in and of themselves, you've seen so

10   much worse, Judge, and a lot of them didn't make sense.  And

11   ultimately Mr. Robinson complied.

12       So, again, I know it's a very, very low standard.  We're

13   not here to adjudicate, even for a revocation hearing, but I

14   think there's a lot to give you pause, Judge.  And to say

15   that Mr. Robinson shouldn't be in jail for this and that's --

16   I'm just asking for his release.  I think you should dismiss

17   it.  I think the testimony is clear that he didn't really

18   make these violations.  He submitted to the urinalysis.  He

19   submitted to the patdown search.  And who knows what this

20   handheld test -- I think is unreliable so I don't -- I think

21   you should dismiss it.

22       But in the alternative, Judge, at a minimum, please

23   release Mr. Robinson.

24       **MAGISTRATE JUDGE MCCARTHY:**  Okay.

25       Mr. Wright.

US vs. Robinson - 20-CR-185

1      **MR. WRIGHT:**  Well, as Mr. Passafiume just mentioned, he

2  says he thinks it's unreliable relating to the breathalyzer

3  of what tested positive for the defendant consuming alcohol

4  but he has no proof of that.

5      Number two, what has been presented today is the

6  defendant's continuance conduct and failure to abide by the

7  rules of not only the Court but also the RCC as well, your

8  Honor.

9      Therefore, the government continues its motion for the

10  defendant's detention, at least until he can present his case

11  in front of Judge Vilardo.

12      **MAGISTRATE JUDGE MCCARTHY:**  All right.  Thank you.

13      It is a probable cause hearing not for me to determine

14  whether the conditions have been violated.  But having heard

15  all the testimony, I think there is probable cause.

16      Whether Judge Vilardo will determine that, in fact,

17  there's been a violation, obviously is up to him and I think

18  it's because there's probable cause of repeated incidents

19  here.  I'm going to detain him pending the hearing before

20  Judge Vilardo.

21      But I will, Mr. Passafiume, if you want to get an

22  earlier hearing with Judge Vilardo, you're free to contact

23  his chambers.  But just we're talking, then, about

24  March 28th, next Monday at 11 a.m. and you should check with

25  his chambers as to whether that will be in person or by Zoom.

US vs. Robinson - 20-CR-185

1        Thank you, all.

2        **MR. PASSAFIUME:**  Thank you, Judge.

3        **MR. WRIGHT:**  Thank you, your Honor.

4        **MR. BAGLEY:**  Thank you, Judge.

5        (WHEREUPON, proceedings adjourned.)

6

7

8                *          *          *

9              **CERTIFICATE OF TRANSCRIBER**

10

11         In accordance with 28, U.S.C., 753(b), I

12    certify that this is a true and correct record of proceedings

13    from the official audio recording of the

14    proceedings held in the United States District Court

15    for the Western District of New York before the

16    Honorable Jeremiah J. McCarthy on March 22, 2022.

17

18

19    S/ Diane S. Martens

20    Diane S. Martens
      Transcriber

21

22

23

24

25